Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

OMARI TAYLOR,

Plaintiff,

v.

JON VANGESEN and KITSAP COUNTY,

Defendants.

NO. 3:18-cv-05682-BHS

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT "FRISK" CLAIM

**NOTE ON MOTION CALENDAR: July 9, 2021**

## I.    INTRODUCTION AND RELIEF REQUESTED

This § 1983 suit brought by Plaintiff Omari Taylor ("Taylor") against Defendant Jon VanGesen ("VanGesen") includes claims alleging violations of the Fourth Amendment right to be free from unreasonable searches and seizures.  In this motion, Taylor moves the Court for an order granting judgment as a matter of law on his Fourth Amendment "frisk" claim. The record is devoid of any specific, articulable facts upon which VanGesen could have reasonably inferred that Taylor was armed with a weapon and posed a danger to him or others.  No jury could find that VanGesen's frisk of Taylor was justified. Thus, Taylor is entitled to judgment as a matter of law on the issue of liability.  This motion is supported by the Declaration of James E. Lobsenz, the Exhibits attached thereto, and the pleadings and documents on file in this case.

## II.    PROCEDURAL HISTORY OF THE FRISK CLAIM

On September 24, 2020, over defendant VanGesen's objection, this Court granted

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 1
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Taylor's motion to amend his complaint to add a claim that VanGesen subjected Taylor to an unlawful "frisk" in violation of the Fourth Amendment *Dkt*. 56.  VanGesen opposed the motion on several grounds including the fact that he would have to retain the services of an expert to address the reasonableness of his actions related to the frisk.  *Dkt.* 52.  VanGesen also maintained that Taylor's proposed new frisk claim opened up "a host of new issues … the complete ramifications of which have not been explored at this time, but will impact at a minimum, the scope of discovery, depositions and the witness list." *Id*. at 9:5-7. This Court was not persuaded by VanGesen's prejudice argument, but further ordered that if "VanGesen finds that he requires additional discovery to fairly present his case and prepare for trial, the Court would consider a motion for a continuance." *Dkt*. 56, at 5:8-10.

VanGesen promptly moved for a modification of the scheduling order and leave to conduct additional discovery. *Dkt*. 59.  He asked for "a six month . . . extension of discovery deadlines related solely to the newly filed 4th Amendment search and seizure violation." *Id*. at 2:22-25.  Taylor opposed the motion, noting that "VanGesen cannot identify a single person who could provide information relevant to Mr. Taylor's unlawful frisk claim that is not already known by the parties, or a single subject relevant to Mr. Taylor's unlawful frisk claim that was not already explored in discovery." *Dkt*. 63, at 2:3-6.  In reply, VanGesen noted that the Court had "previously ruled that VanGesen failed to comply with the requirements of Rule 26 . . . and struck disclosed witness Gary Paynter" ordering that VanGesen could not "use Paynter as an expert at trial *unless* VanGesen is able and permitted to comply with Rule 26(a)(2) and other civil rules of procedure." *Dkt*. 64, at 2:27-28, citing *Dkt*. 57, at 3, ¶¶ 17-19.

The Court then granted VanGesen's motion, thereby allowing him to comply with Rule 26(a)(2).  *Dkt*. 70.  VanGesen provided Taylor with a Rule 26(a)(2) report. This compelled Taylor to retain a rebuttal expert.  Taylor provided VanGesen with a Rule 26(a)(2) report for his rebuttal expert on April 7, 2021.  *Decl. James Lobsenz* (*"DJL"*), ¶2. Although VanGesen initially noted the deposition of Taylor's rebuttal expert on May 10, 2021, he cancelled it and

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 2
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

decided not to depose Taylor's expert after all. *Id., ¶*3. Taylor took Paynter's deposition on May 11, 2021. *Id.,* ¶4. After approximately one hour, VanGesen's counsel announced that VanGesen was withdrawing Paynter as an expert and the deposition ended abruptly. *Id.*

The discovery cut off came and went on May 16, 2021. *Id*., ¶5. VanGesen, however, never conducted any discovery during the extended period for discovery (November 10, 2020 through May 16, 2021) which he had requested and which this Court granted. *Id.*[1]

## III.    STATEMENT OF FACTS RELEVANT TO THIS MOTION

The events giving rise to Mr. Taylor's lawsuit (the "Incident") stem from a vehicle equipment infraction. VanGesen asserts that as Taylor drove past him he saw that Taylor's right rear taillight was cracked, and that he detained Taylor in Heather Sinn's driveway in order to investigate that infraction. *DJL*, ¶6, Ex. A, *Deposition of John VanGesen* ("*JVG*"), 64:8-16; 64:23-65:21. After Taylor passed by, VanGesen made a U-turn, followed him, and initiated a "stop" after Taylor pulled into the driveway of Heather Sinn's home on Van Buren Street. VanGesen acknowledges that Taylor had not done anything suspicious up to that point. *JVG,* 44:6-22; 65:18-21.

Although Taylor had turned onto Van Buren, VanGesen mistakenly believed that Taylor had turned onto Patricia Street, a street he was familiar with because he had previously made a drug arrest in a driveway on that street. *JVG*, 65:22-66:17.

Q. Can you explain why you would not know what street it was?

A. Yes, because I've done – I've done cases on both streets . . . and ***Patricia stood out in my mind***. And when he made the quick turn on the street, I – I thought he had turned on Patricia, but that's three blocks to the north.

Q. What is it about this prior incident on Patricia Street that stood out in your mind?

---

[1] VanGesen's motion for an extension of the time to disclose an expert and to take discovery caused a needless increase in the cost of litigation. At a later date Taylor may bring a CR 11(a)(3) motion to recover the expenses of retaining a rebuttal expert and preparing for and taking the deposition of Jeff Paynter. However, since the same relief may be obtained if the Court grants this motion for partial summary judgment, to avoid the litigation of a motion that may prove to be unnecessary, Taylor is not bringing such a motion at this time.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 3
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

> A. ***One of them was a drug search warrant*** where I actually sold drugs to a customer outside of the front door, and ***we arrested him in his driveway***. While we were serving the warrant on the house, another customer came up, and I provided drugs to him out the front door.
>
> Q. And that person was also arrested?
>
> A. Yes.

*JVG,* 66:2-17 (emphasis added).  VanGesen identified the person he arrested as Chambers and said he could not recall if the drug in question was methamphetamine or cocaine.[2]

VanGesen found the way that Taylor parked in Sinn's driveway to be suspicious. *JVG,* 70:13-21.  VanGesen wanted "[t]o know if [Taylor] was connected to the resident" or not. *JVG,* 102:15-21. If he wasn't connected to a resident "that would put extra questions in my mind of why is he just driving down the road and pulling into a stranger's driveway." *JVG*, 102:24-103:2.  VanGesen was suspicious "because he didn't pull into the driveway the way a person parking in the driveway would" and because he pulled into the first driveway on the street. *JVG,* 70:15-72:1-6. According to VanGesen, "it appeared that [Taylor] didn't live there" because of the way that he parked. *JVG,* 90:6-10. "[O]ne of the things that concerned [VanGesen] was the possibility that [Taylor] would get inside the house before [VanGesen] could contact him." *JVG,* 72:10-15. VanGesen hurriedly popped out of his patrol car because he knew that if Taylor entered the house and then refused to come out, VanGesen could not make him come out again. *JVG,* 73:13-74:1-4.

VanGesen "had a question in [his] mind" as to whether Taylor knew anyone who lived at the house and so he asked Taylor about that. *JVG,* 79:6-9.  As he approached the driver's window, VanGesen's intention was to "investigate the violation, to retrieve his paperwork and find out if he was a licensed driver, if he had valid insurance, and if he had the vehicle registration that was valid, and handle the traffic stop." *JVG,* 81:1-7. He "explained to [Taylor]

---

[2] Chambers' conviction was affirmed on appeal; the drug in question was methamphetamine. *DJL,* ¶7, Ex. B, opinion in *State v. Chambers,* 134 Wn. App. 853, ¶2, 142 P.3d 668 (2006). Chambers was the driver of the car that pulled into the driveway on Patricia Street. 134 Wn. App. at ¶¶ 3-4.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 4
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

the reason for the stop, the defective taillight, the white light to the rear, and requested his driver's license, vehicle registration, and proof of insurance." *JVG,* 83:16-19. When VanGesen asked Taylor if he lived there Taylor did not respond. *JVG,* 105:19-106:7.[3]  Instead, Taylor simply opened the glove box and began to look for the things that VanGesen asked him to produce. *JVG,* 84:24-85:13. VanGesen acknowledges that Taylor eventually provided him with a valid driver's license (*JVG,* 86:25-87:5; 95:3-10), a valid vehicle registration, and a proof of insurance card which showed that his insurance had expired the day before. *JVG,* 96:11-18.

About one minute after VanGesen arrived at Sinn's driveway, he asked police radio dispatch to send a second police car.  *JVG,* 87:16-25. When asked why he called for a second car, VanGesen said "[b]*ecause Mr. Taylor was* already not answering my questions and *accusing me* of stopping him only because he was black." *JVG,* 88:1-6.  When VanGesen told Taylor that he was detaining him because of the cracked taillight, Taylor said "[w]e both know that's not why you stopped me." *JVG,* 90:12-16.  VanGesen failed to include the fact that Taylor accused him of racial profiling in his police report.  When asked why he omitted this fact, he said because he "didn't think it was important." *JVG,* 89:16-23; 90:17-19. When asked why he didn't think it was an important fact to include in his report if it was important enough to make him call for a second car, VanGesen then *denied* that the accusation was what made him call for a second car; he asserted that he requested a second car *because he was afraid*:

> Q. But that was the reason you asked dispatch to send another car, right?
>
> A. It is not.  The reason I asked dispatch to – his race is not a reason I asked for a second car.  I asked for a second car **because he** was not answering my questions and was – and **was creating fear in – in me**, because a normal person would answer a question they're asked, and compounded with the fact that he had appeared to have quickly pulled into this driveway of a house, blocking another car in, that it appeared that he didn't live there because he pulled in blocking both driveways.  And I was by myself on patrol, with a gun on my side, and I wanted a second unit at the scene.

---

[3] Initially VanGesen said, "[i]t never occurred to me that he didn't hear what I asked him." But when confronted with his own written statement in his police report ("I did not know if Taylor was ignoring me or didn't hear the question"), VanGesen said, "I gave him the benefit of the doubt that he didn't hear me." *JVG,* 106:9-107:16.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT "FRISK" CLAIM – 5 (3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*JVG,* 89:24-90:11 (emphasis added). VanGesen denied that the racial profile accusation made him angry and explained that it made him afraid he was going to get sued:

> Q. Okay. And when he said it, you knew that he was accusing you of a racist stop, right?
>
> A. I knew that that's what he was alluding to, yes.
>
> Q. And that made you angry, right?
>
> A. No. It didn't create anger in me.
>
> Q. Did it have any effect on you?
>
> A. It made me in fear that he was trying to create a situation having to do with his race and not about a broken taillight.
>
> Q. It – it put you in fear?
>
> A. Correct.
>
> Q. So any time – are you saying any time a black man says, "I think you're treating me in a racist way" it puts you in fear?
>
> A. I think any time anybody questions my intent of my actions, I want a second person there to witness what's actually occurring, and I requested a second deputy respond.
>
> Q. But at this point when he says, "We both know that's not why you stopped me," *what are you afraid of*?
>
> A. Well, he's already alluding my intent is other than it was, to stop him for a broken taillight. *My fear is that when people accuse you of things like that, their intent is to maybe file a lawsuit three years later* to say that you did it for that reason.

*JVG,* 90:20-91:20 (emphasis added).

VanGesen asked Taylor what he was doing in the neighborhood and where he lived. Taylor replied, "[y]ou already know I don't live here. You've got my driver's license and you've looked at my address" and he also told VanGesen that he was at that residence to have dinner with a friend. *JVG,* 100:1-13; 121:18-126:19. VanGesen's refusal to believe that Taylor had legitimate business at the residence prompted Taylor to tell VanGesen that "he [VanGesen] was going to feel really stupid" when he found out that Taylor was at the residence to visit

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 6
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Heather Sinn—who had come out of her home upon hearing a commotion. *DJL*, ¶9, *Deposition Omari Taylor* ("*OT*"), 133:23-134:4; *DJL*, ¶8, *Deposition Heather Amanda Sinn* ("*HAS*"), 10:1-3. VanGesen admits that at no time during the incident did he ever have any specific indication that Taylor was under the influence of drugs. *JVG,* 108:15-21.

Although it is undisputed that Taylor had already said he knew that his taillight was cracked, VanGesen asked him to step out of his car because "as a courtesy, I was going to have him come to the back to verify, indeed, yeah, this is the defective equipment . . . ." *JVG*, 109:14-16.

> Q.  You're saying your intent was to have him come back and show him that he actually had a busted – a cracked taillight?
>
> A.  Correct.
>
> Q.  He already told you that he knew that, right?
>
> A.  He did as we were exiting the car to go look at the broken taillight.

*JVG,* 109:20-110:1.  VanGesen claims that Taylor said he didn't have to get out of the car, but acknowledges that he got out of the car anyway.  *JVG,* 110:2-12; 11:24-112:22:2.  VanGesen says it never crossed his mind that Taylor might be afraid of him because all was going well up to that point.

> A.  No.  It really didn't cross my mind because I explained that we were going to look at the taillight, which he said he already knew was broken.  So at that point ***it was going well***.  He seemed to be compliant other than that first – that no answer about living there.

*JVG,* 110:22-111:2 (emphasis added).

Eventually VanGesen acknowledged that he wanted him to get out of the car so that he could clear the car as "safe." He acknowledged "[r]emoving him from the car would definitely help" by enabling him to see more clearly what was inside the car, but he asserted that was not his intent. *JVG,* 111:16-19.

> Q.  Okay.  So if the reason for asking him to get out of the car is to show him the broken taillight and if he says, "I know I have a broken taillight," is there any other reason now to ask him to get out of the car?

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 7
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

A. I wanted him out of the car during the rest of the contact because of all the debris that was inside the car that I couldn't clear as safe. And I didn't want to walk back up to the car with Mr. Taylor – after I filled out the infraction, if that's what I was going to do, I didn't want Mr. Taylor to still be in that driver's seat when I came back to the car the second time. So that's another reason why I had him step out of the car.

*JVG,* 111:3-15.

Up to this point – except possibly for the fact that he didn't answer the question, "Do you live here" until it was asked a second time – VanGesen admits that Taylor had done everything he asked him to do. *JVG,* 112:5-10. VanGesen then told him to walk to the back of the car and Taylor complied with that instruction as well. *JVG,* 113:4-17.

He also instructed Taylor to remove his hands from his pockets and eventually Taylor complied. *JVG,* 113:18-114:15. Then Taylor put his hands back in his pockets and again VanGesen told him to take them out and again Taylor complied. *JVG,* 114:20-115:2.

A. He didn't have anything in his hands initially when he first removed his hands from his pockets as we're walking back to the back of the car. The second time that he went back into his pockets after the multiple requests to keep his hands out of his pockets, he came out with the cell phone and that YMCA card.

*JVG,* 115:20-25. Eventually VanGesen admitted that he was not concerned that Taylor might hit him with the cell phone. *JVG,* 120:15-121:9. Nor was he concerned about the possibility that Taylor was going to use the phone to videotape his interaction with him because VanGesen already knew that Heather Sinn was videotaping their interaction. *JVG,* 121:17-118:2.[4]

At this point, VanGesen told Taylor that he was going to pat him down. *JVG,* 122:3-10. He told Taylor to put his hands on the trunk of his car and to spread his feet. *JVG,* 123:15-21; 124:1-3. Taylor did put his hands on the car, but VanGesen told him his hands were too

---

[4] VanGesen's yelling and tone of voice prompted Heather Sinn to call 911 to request additional police presence because she felt that VanGesen was "part of the problem." *HAS,* 12:1-15; 12:23-13:18. Sinn told the 911 operator that VanGesen was "yelling at my friend." and that he yelled at her and told her to go back into her house. *DJL,* ¶10, Transcript of Recording of Sinn 911 call, Ex. E. Although she was 50-60 feet away from him, VanGesen told her to go inside and she complied. *JVT,* 152:3-153:11. VanGesen admits she never interfered with his investigation. *JVT,* at 153:6-11.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT "FRISK" CLAIM – 8 (3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

close to his waist, to move his hands further away from his body, and to put his cell phone down. *JVG,* 122:17-123:25. VanGesen also told Taylor to spread his feet further apart because VanGesen wanted to get Taylor off balance. *JVG,* 122:19, 124:1-9.

VanGesen concedes that at the point he decided to frisk Taylor, the *only* thing he knew that made him think Taylor was armed was the fact that he kept putting his hands in his pockets:

Q. Okay.  And at this point when you say, "Step back and spread your feet," are you touching him at this point?

A. No.  I had not initially.

Q. Okay.  And he did not step back; is that right?

A. Correct.

Q. Okay.  **At this point** when you say these instructions, these three things, at this point, ***tell me if you thought you had seen anything that made you think he was armed***?

A. ***Yes***.

Q. ***What had you seen that made you think he was armed***?

A. ***I had seen him put his hands into his pockets four times***[5] ***after being told not to do it again, to keep his hands out of his pockets.***

Q. Okay. ***Anything else***?

A. ***Not up to that point, no***.

Q. Okay. Up to that point, had you seen ***anything else*** that made you think he was a danger to you?

A. Yes.

Q. What?

A. ***His noncompliance*** with simple requests.  Because it's his hands that could possess a weapon to kill me, not if he kept them out of his pockets empty.

---

[5] In his written police report, VanGesen only mentions two times that Taylor put his hands in his pockets, and mentions *only one time* that he told Taylor to take them out of his pockets. In his report VanGesen wrote that Taylor complied but then put them back in his pockets.  VanGesen did not make any further mention in his report of his ever again telling Taylor to take his hands out of his pockets.  His report reads: "I repeated my instructions to him and he walked to the back of the car and immediately put both hands in his front pants pockets. I told him to take his hands out of his pants and he refused. I then told him again to get his hands out of pockets and he did but then immediately put them back in again."  *DJL,* ¶11, Ex. F, p.4.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 9
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Q. When you say noncompliance, *you're referring to putting his hands in his pockets repeatedly*?

A. Correct.

Q. *Anything else you are referring to by noncompliance?*

A. *No.*

JVG, 128:18-129:23 (emphasis added).

Although VanGesen wrote in his Incident Report (see *DJL*, ¶11, Ex. F, at 5) that he believed Taylor had "weapons *and/or* contraband" on his person and conducted a pat down search of Taylor on that basis, his deposition testimony conclusively establishes that there was *never* a time where VanGesen formed a belief that Mr. Taylor actually had either illegal weapons or drugs on his person. *JVG*, 145:13-148:5.

VanGesen maintains that Taylor refused to spread his feet and refused to move his hands as instructed: "He said he was cooperating, but he was not cooperating. He wouldn't let me to get his hands out. He wouldn't allow me to spread his feet. So he was saying he was cooperating, but his behavior indicated that he wasn't cooperating."[6] *JVG,* 131:22-132:10. Heather Sinn testified that she did not think Taylor was resisting when officers "kicked" his feet apart, patted him down, and placed him under arrest. *HAS,* 23:3-24:18.

VanGesen admits he initiated body contact with Taylor by pushing up against him so that he could not step back from the trunk of the car, and then he pushed Taylor in the chest with two hands, shoving Taylor away from him. *JVG,* 135:13-136:1; 136:14-25; 137:12-15. VanGesen then instructed Taylor to go stand in a grassy area some distance away from

---

[6] Under Washington law, when a person is "the target of an investigative detention, [the] lack of an obligation to assist the police precludes the use of the obstructing statute to enforce cooperation, a position bolstered by the resisting arrest statute. The legislature has only imposed a duty to cooperate with a lawful *arrest.* Since the resisting arrest statute does not even purport to address detentions or other seizures short of an arrest, the statute cannot be said to have imposed any duty of cooperation with the detention. . . ." *State v. D.E.D.*, 200 Wn. App. 484, 496, 402 P.3d 851 (2017). *Cf. Amili v. City of Tukwila*, 31 F.Supp.3d 1274 (W.D.Wash. 2014) (motion for partial summary judgment for plaintiff granted; police could not rely on Washington's obstructing statute as a basis for a lawful arrest because suspect had no duty to cooperate with an unlawful detention). Thus, even if Taylor was in fact failing to cooperate with VanGesen's frisk instructions, that lack of cooperation still could not form the basis for a lawful arrest for obstructing.

---

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 10
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

VanGesen and Taylor eventually complied and went and stood there.  *JVT*, 140:20-141:13. Taylor asked VanGesen if he was under arrest and VanGesen responded that he was not free to leave.  *JVT*, 142:22-143:14.  VanGesen admits that Taylor was under arrest at that point.  *JVT*, 143:8-9.

VanGesen also admits that at no time during the entire incident did Taylor ever push him, hit him, touch him, or curse him.  *JVT*, 139:14-23.[7]  When Taylor was booked at the Kitsap County Jail, on the form he submitted and signed as the arresting officer, VanGesen stated that Taylor never engaged in any assaultive or violent behavior, never tried to elude or escape custody, never did anything to suggest mental illness, and did nothing to indicate that he had "any dangerous contraband or drugs or weapons."  *JVT,* 194:14-198:16.

Taylor was arrested, allegedly for obstructing a police officer, and was also cited for a defective taillight in violation of RCW 46.37.050. The obstructing charges were dismissed on the prosecutor's motion.  *JVT*, 193:22-194:8.

## IV.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Here, there are no issues of material fact regarding Taylor's unlawful frisk claim.  When the evidence is considered in the light most favorable to VanGesen, he has not and cannot point to any specific, articulable facts upon which he could have reasonably inferred that Taylor was armed and dangerous.  There are no facts from which a jury could find that the frisk was justified under the Fourth Amendment.  Thus, Taylor is entitled to judgment as a matter of law and the only issue for trial on Taylor's unlawful frisk claim are the measure of damages to which Taylor is entitled.

---

[7] He also admits Taylor "didn't say anything verbally that was threatening" and simply asserts that he "perceived" that Taylor was threatening "from his behavior." *JVT, 139:24-140:6.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 11
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

## V.   ARGUMENT

**A.    A frisk is a serious indignity not to be undertaken lightly.  African-Americans are particularly likely to be subjected to unlawful frisks.**

As the Supreme Court recognized over fifty years ago, "[e]ven a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry v. Ohio*, 392 U.S. 1, 24-25, 88 S.Ct. 1868 (1968). The Court rejected as "fantastic" the contention that a frisk was merely "a petty indignity." *Id.* at 17.  Courts have repeatedly cited with approval the policy assessment in *Terry* that a frisk for weapons "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Thomas v. Dillard*, 818 F.3d 864, 876 (2016) (quoting *Terry v. Ohio*, 392 at 17.[8]

**B.    The constitutionality of an investigatory stop and the constitutionality of a frisk must be analyzed separately.  Police may not adopt the perfunctory attitude that so long as they have reasonable grounds to detain a person for investigation they also automatically have reasonable grounds to frisk them.**

Just because an officer has legally sufficient grounds to stop or detain a person, that does not mean that he also has a legally sufficient basis to frisk him.  "The stop and the frisk, must be analyzed separately, the reasonableness of each must be independently determined." *United States v. I.E.V.*, 705 F.3d 430, 434-35 (9th Cir. 2012) quoting *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).  The *Thomas* case illustrates this point.

In *Thomas*, Officer Siegel stopped Thomas who was attempting to exit the lot of a bank that was the scene of an alleged scheme to pass counterfeit money.  As Siegel approached, Thomas exited his vehicle and began walking towards the Siegel.  *Id.* at 624.  Siegel asked Thomas what he was doing in the parking lot and requested identification.  *Id.*  Thomas replied

---

[8] People of color are particularly liable to be the target of unlawful frisks. As Justice Breyer noted in his concurring opinion in *Illinois v. Wardlow*, 528 U.S. 119, 132 n.7, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (Breyer, J., concurring), citing Casmir, *Minority Men: We are Frisk Targets,* N.Y. Daily News, Mar. 26, 1999.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 12
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

that he was waiting for his wife to exit the bank and produced his license, which Siegel examined but did not immediately return to Thomas. *Id.*

Like VanGesen in the present case, Officer Siegel kept Mr. Thomas' identification and continued the detention *after* the initial investigatory questions. Siegel then asked Thomas whether he had any weapons. *Id.* When Thomas did not respond, Siegel patted down the exterior of Thomas' jacket and discovered a handgun. *Id.* Siegel's testimony regarding the circumstances that led to the frisk of Thomas is similar to VanGesen's testimony in this case. When asked why he patted Thomas down, Siegel answered in part:

> Basically for my own safety. I was by myself. . . . I didn't want any surprises. So I patted down just about everything under that kind of circumstance. . . . he is a pretty big guy. I patted him down because I didn't want to get in any trouble. I wanted to see what was in front of me, make sure they didn't have a weapon on them.

*Id.* at 629.

The Ninth Circuit concluded that the facts surrounding Siegel's initial investigatory stop of Thomas provided no basis for the frisk. *Id.* at 628. The court explained that there was nothing "inherently suspicious" in the fact that Thomas got out of his car without being asked and that since nothing suggested Thomas made any abrupt movements or engaged in suspicious, furtive behavior, there was no reasonable justification for Officer Siegel to fear for his safety. *Id.* In rejecting the government's argument that Siegel acted reasonably to protect himself, the court also explained:

> The way that Officer Siegel conducted his investigation, however, ***cannot be used to bootstrap a justification for the detention and frisk of Thomas***..... If we followed the government's logic, all investigatory stops would necessarily include a frisk. Without any reason whatsoever, a police officer could routinely ask about weapons and frisk the individual under suspicion. Such a result would not only destroy the necessary distinction between the stop and frisk, but would indiscriminately subject countless individuals to the humiliation and invasiveness of a bodily frisk. We cannot allow the protections afforded by the Fourth Amendment to be tampered with so carelessly.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 13
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*Id.* at 629-30.   Considering the totality of the circumstances, Siegel's actions reflected "a perfunctory attitude towards frisking a suspect" rather than reasonable fear that Thomas was armed and dangerous.   *Id.* at 629.   Accordingly, the Court of Appeals affirmed the district court's ruling granting the defendant's motion to suppress because the frisk was unjustified—even though the initial stop met the constitutional Fourth Amendment standard.

**C.**    **To justify a frisk, an officer must be able to point to specific articulable facts which establish an objectively reasonable suspicion that the person is armed and dangerous.**

Under *Terry v. Ohio*, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others," the officer can frisk the person in order "to determine whether the person is, in fact, carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24.

> [T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual….***the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger***.

*Terry*, 392 U.S. at 27 (emphasis added).

"Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 337 n.2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "[A] mere inchoate and unparticularized suspicion or hunch that a person is armed and dangerous does not establish reasonable suspicion, and circumstances suggesting only that a suspect would be dangerous *if* armed are insufficient." *Dillard*, 818 F.3d at 876-886 (italics in original) (noting that suspect's loose clothing, which was capable of hiding a weapon, and suspect's act of stepping away and refusing a frisk, did not justify a reasonable suspicion allowing for a frisk).

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 14
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

In other words, under the Fourth Amendment, an officer "must be able to point to *specific and articulable facts*" which, taken together with all reasonable inferences therefrom, reasonably justify the intrusion of the frisk. *Dillard*, 818 F.3d at 876 (citing *Terry*, 392 U.S. at 21). *See also Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889 (1968) ("In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.").

**D.      The fact that the suspect is visibly nervous or fidgety or touches his clothing is not legally sufficient. In *Ford* the Ninth Circuit rejected the argument that an officer has a legal basis to conduct a frisk whenever a person reaches for a pocket.**

Neither the fact that a person seems nervous, nor the fact that they are "fidgeting" and touching their clothing, is legally sufficient to justify a frisk. As the Ninth Circuit said in *I.E.V.*:

> [E]ven if Officer Cooper's testimony that the Defendant was fidgeting could be credited, such behavior was not sufficient to warrant a frisk of the Defendant for two reasons.  First, we join our sister circuits that have refused to allow police officers to justify a *Terry* search based on mere nervous or fidgety conduct and touching of clothing.

*I.E.V.*, 705 F.3d at 438 (citations omitted). *Cf. United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017) ("[T]he facts that Job's pants appeared to be 'full of items' and he appeared nervous do not support the conclusion that he was engaged in criminal activity" or possessed a weapon).

In *I.E.V.,* the Court cited two cases with approval: *United States v. McKoy,* 428 F.3d 38 (1st Cir. 2005) and *United States v. Ford*, 333 F.3d 839 (7th Cir. 2003).  In *McKoy,* the Court explained that "nervousness is a common and entirely natural reaction to police presence" and that the defendant's motion of reaching towards the center console of his car, while potentially to hide a weapon, "is also consistent with reaching for a driver's license or registration, a perfectly lawful action that is to be expected when one is pulled over by the police."  428 F.3d at 40.  "The Government's proposed standard comes too close to allowing an automatic frisk of anyone who commits a traffic violation in a high crime area." *Id.*

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 15
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Similarly, the *I.E.V.* Court cited *United States v. Ford*, 333 F.3d 839 (7th Cir. 2003) with approval.  There, despite the fact that the defendant "appeared nervous, looked around, stepped backward *and reached for his pocket* after he activated [a] metal detector," the Court held that this "was insufficient to create a reasonable suspicion that would justify a protective pat-down." *I.E.V.*, 705 F.3d at 438, citing *Ford*, at 842 & 845 (italics added).  And in *United States v. Weaver*, 975 F.3d 94, 104 (2d Cir. 2020), the Court rejected the argument that a frisk was justified simply because Weaver made "a subtle tug of his waistband." "[G]iven that Weaver's pants were lower than waist level, such a subtle tug is no more suggestive of a firearm than it is of Weaver simply wanting to raise his pants because they slipped lower than he preferred." *Id.*

While VanGesen contends that he had a reasonable basis to frisk Taylor because he kept putting his hands in his pockets, the Fifth Circuit rejected the exact same argument in *United States v. Monsivais*, 848 F.3d 353 (5th Cir. 2017).  There officers stopped and questioned a pedestrian who appeared to be walking away from a disabled vehicle.  The pedestrian "appeared nervous and jittery" and "repeatedly put his hands in his pockets, but took them out each time at Baker's request." *Id.* 356.  After four minutes, the officers decided to frisk Monsivais "for officer safety reasons."  This led to the discovery of methamphetamine.  The court held that the officers had no lawful basis to detain or frisk him and reversed Monsivais' conviction.  Similarly, VanGesen had no lawful basis to frisk Taylor simply because he had to keep reminding him to take his hands out of his pockets.

**E.      It is not sufficient that articulable facts provide the officer with an objectively reasonable basis for believing that a person is concealing *something*.  There must be an objective factual basis for believing that that something is a weapon.**

In *I.E.V.*, the only specific evidence the government offered to justify the frisk was that the defendant "seemed very nervous and continually touched his abdomen area," 705 F.3d at 433.  It turned out that the defendant had concealed some drugs in that area under his shirt.  The

fact that he continually touched his abdomen *did* give rise to a reasonable inference that he was concealing *something* there.   But it *did not* provide an objectively reasonable basis for suspecting that that something was a weapon.   Therefore, that touching behavior failed to provide a legally sufficient justification for a frisk.

Similarly, in *United States v. Weaver*, 975 F.3d 94 (2nd Cir. 2020), the Court held the frisk unlawful because although police had reasonable grounds to suspect that the defendant was hiding *something* in his pants, they had no reason to suspect that the object that he was hiding was a weapon.

> The Government's strongest fact is Weaver's movements in the passenger seat, which Officer Tom described as "with both hands kind of pushing down on his pelvic area and squirming kinda in the seat left and right, shifting his hips." Officer Tom believed that Weaver was "trying to push something down." [Citation].  But nothing in Officer Tom's description that Weaver was squirming and trying to push something down suggests that this "something" was a weapon.  Weaver's actions were equally consistent with the act of secreting drugs or other nonhazardous contraband.  The distinction between the two is key
> . . . .
>
> . . . We have no doubt that Officer Tom reasonably suspected that Weaver was hiding *something* based on his downward motion and wiggling.  But there are no specific or articulable facts that Weaver was hiding something *dangerous*. As *Hussain* and Supreme Court precedent establish, there is a distinction between hiding something and hiding something dangerous.  It is not enough that officers rely on a suspicion that a suspect was hiding something, even if that something is contraband like drugs – rather, officers must have a suspicion based on articulable facts that the suspect was "hiding something dangerous." For this reason, Weaver's actions in the front passenger seat did not provide the SPD with an objectively reasonable belief that he was armed and dangerous.

*Weaver*, 975 F.3d at 103-04 (citations omitted).

**F.      The only things Taylor ever took out of his pocket were a cell phone and a YMCA card.  Many people use cell phones to video their interaction with police as a means of protecting themselves from police violence and assault.**

Logically, the fact that Taylor removed a cell phone from his pocket could only have *reduced* any fear that Taylor was armed and dangerous.  Taylor's repeated reaching into his pocket was thus explained as an action designed to retrieve a phone – not a gun.  *Accord United*

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT "FRISK" CLAIM – 17 (3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

*States v. Hussain,* 835 F.3d 307, 315-16 (2d Cir. 2016) (Defendant "Cunningham failed to put down his phone as soon as Officer McAloon asked him to do so. And when Officer McAloon asked Cunningham to 'produce his license and registration,' Cunningham again failed to respond right away"; Court held frisk unlawful, noting that the officers knew Cunningham was holding a cellphone, not a firearm).

Many people believe that filming a police/citizen interaction is a way of deterring the police officer from assaulting the citizen. *See R. Kansara,* Wall Street Journal*, July 6, 2020, "Black Lives Matter: Can viral videos stop police brutality?"* In this case, VanGesen admits that he saw Sinn inside her house looking out a window and holding a cell phone. *JVT*, 155: 12-19. It appeared to VanGesen that she was filming what VanGesen was doing, and in fact she was filming him. *JVT*, 155:20-156:2. Her act of filming may have had just such a deterrent effect. In any event, the fact that Taylor wanted to access his cell phone, whether it was to make a phone call or film his interaction with VanGesen, provides no basis for a belief that Taylor posed a danger to VanGesen.

**G. Even when an officer has an articulable basis for believing that a person has a metal object on their person, that alone does not justify a frisk.**

Even when the activation of a metal detector gives an officer an objectively reasonable basis for believing that a person has some kind of a metal object in his pocket, and that person then moves his hands towards his pocket, those facts do *not* meet the *Terry* standard required before a frisk can be legally justified. In *Ford, supra,* the defendant was entering a skating rink when he set off a metal detector. In response to a police officer's instruction to step forward, "Ford appeared nervous, looked around, reached for his breast pocket, and started to back away – but said nothing. Officer Thomas pulled Mr. Ford's hands up and performed a pat-down search. Officer Thomas felt a hard, heavy, metal object in Mr. Ford's breast pocket" which turned out to be a scale, and residue of crack cocaine. *Id.* at 841. Ford pushed Officer Thomas and tried to run away but was caught and then subjected to a second pat-down in which the

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 18
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

officer discovered crack cocaine.  *Id.*  The Court of Appeals rejected the argument that the act of reaching towards his pocket was an articulable fact that provided an objectively reasonable basis for suspecting that he was armed even though it did provide a basis for believing that he had something metal on his person:

> Almost anyone who passes through a metal detector and activates it is alarmed and reaches for those areas of clothing that might have triggered the alarm.  Such actions do not give rise to a reasonable suspicion to perform a pat-down, which requires that a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*Id.* at 845 (internal quotation marks and citation omitted).[9]  Similarly, the Ninth Circuit has held that "even after activating [a metal detector], a person may not be subjected to a pat-down search unless he fully and voluntarily agrees to it.  He is under no compulsion to submit." *McMorris v. Alioto*, 567 F.2d 897, 901 (9th Cir. 1978).  In the present case, VanGesen had no basis to believe that Taylor had any kind of a metal object in his pocket, and yet he compelled Taylor to submit to a frisk solely because Taylor put his hands in his pockets, and at some point took out a cell phone.

**H.    A reasonable suspicion that a person possesses illegal drugs is *not* sufficient to justify a frisk. The *only* justification is a suspicion supported by articulable facts that he is armed and dangerous.**

VanGesen made the same mistake that the district court made in *United States v. I.E.V.*, 705 F.3d 430, 439 (9th Cir. 2012), citing *Terry v. Ohio,* 392 U.S. at 29 (1968)(italics in original): In that case, the district court ruled that "[a] frisk is justified when law enforcement suspects weapons *or drugs*, based on the totality of the circumstances, as well as to protect themselves." *I.E.V.*, at 439 (italics added).

In other words, the district court erroneously assumed that a frisk is justified *either* if an officer suspects weapons *or* drugs.  However, *Terry* makes clear that

---

[9] *Cf. United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) ("there was nothing sinister or menacing about McKoy's reaching movement toward the center console. Although it is possible that such a movement could be made to get a weapon, the movement is also consistent with reaching for a driver's license or registration, a perfectly lawful action that is to be expected when one is pulled over by the police.")

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 19
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

the '*sole justification*' for a pat-down is the protection of the police officer and others nearby."

*I.E.V.* at 439, citing *Terry*, 392 U.S. at 29 (emphasis added).

Similarly, in his incident report, VanGesen stated multiple justifications for his desire to search Taylor and he stated them in the alternative.  His report states:

Due to TAYLOR's noncompliance to my commands, his repeated behaviors of placing his hands in his pockets, I believed TAYLOR had a concealed weapons *and/or contraband* on his person *and/or* he was about to assault me and he would continue to resist my attempts to pat him down for my safety.

*DJL*, ¶11, Ex. F, at 5.

But a belief or suspicion that a person is in possession of illegal drugs ("contraband" to use VanGesen's term, see *JVG*, 147:16-22) is completely irrelevant to the inquiry of whether it was objectively reasonable to believe that a person is armed with a weapon.  Right from the very start VanGesen suspected that Taylor had illegal drugs either on his person or in his car, because VanGesen thought (incorrectly) that Taylor had pulled into the driveway of a house on Patricia Street where VanGesen had made a drug bust in the driveway of a residence.  VanGesen acknowledged that he questioned Taylor's assertion that he had pulled into that driveway because he had plans to have dinner with a friend who lived there. *JVG*, 100:3; 102:24-103:8. Moreover, VanGesen admitted that after Taylor had been arrested for "obstructing" VanGesen wanted to search his car for anything that would either support the charge he was arrested for "or show evidence of new charges" or "new crimes." *JVT*, 167:14-22;[10] 168:1-22; 169:10.

After reviewing his report, VanGesen acknowledged that Taylor said he could not search his car. *JVT*, 169:17-171:16.  He also acknowledged that he knew he could not search the car without a warrant and he knew he did not have probable cause to get a warrant, but he thought he could search Taylor's car if he got the permission of the car owner (which the vehicle

---

[10] "Q. Why did you want to search his car? A. I want to search any client's car, any defendant's car that's arrested and going to jail, because there could be additional evidence or reasons for their behavior, contraband, or other illegal things that are in their possession."

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

registration showed to be Taylor).  *JVT,* 172:9-173:16.  After he arrested Taylor, he looked through the car windows; he admitted that he was looking for drugs.  JVT, 175:6-17.

There were no drugs in the car; Taylor really did know Heather Sinn; and he really was there to have dinner with her.  But even if VanGesen had actually had an objectively reasonable basis for believing that Taylor had drugs on his person, that *still* would not justify his action in frisking Taylor.  Because a frisk is for the limited purpose of ensuring the safety of the officer, a frisk must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. Drugs are not weapons.  Thus, a person in possession of cocaine or methamphetamine is neither "armed" nor "dangerous" because he possesses such substances.

I.      **Nature of the offense under investigation.**

The type of crime being investigated and the surrounding circumstances are highly relevant in determining whether the facts support a reasonable belief that the suspect is armed and dangerous.  *McKoy*, 428 F.3d 38, 40 (1st Cir. 2005). The nature of the offense under investigation can affect the objective reasonableness of a belief that a person is armed and dangerous.

For example, if the officer is investigating the crime of trafficking in narcotics, that fact does provide some limited support for such a belief because it is well known that drug dealers are often armed with guns.  But if the "offense" under investigation is a mere traffic infraction (and thus not even a crime), that fact weighs heavily *against* the conclusion that a driver or passenger in the vehicle is armed.  As the Court noted in *United States v. Wilson*, 506 F.3d 488 (6th Cir. 2007), the fact that the officer detained the vehicle because he allegedly saw that neither the driver nor the passenger was wearing a seat belt suggests that there was no logical reason to believe that either one was armed. *Wilson*, at 494 (frisk held unlawful, drugs found in frisk

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 21
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

suppressed).  Similarly, in *McKoy* the Court noted that the only reason for the stop was a parking and license plate violation from which no assumption about weapons may be fairly drawn.[11]

**J.      Timing of frisk – the vehicle equipment infraction investigation was complete**

Finally, the timing of VanGesen's decision to frisk Taylor—which did not occur until *after* VanGesen had already "completed a large portion of his investigation of the vehicle without facing any threatening behavior" from Taylor—"undermines the well-settled….purpose of a *Terry* stop" which is to allow the officer to pursue his investigation without fear of violence.  *I.E.V.*, 705 F.3d at 438.  A traffic stop that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes on the motorist's Fourth Amendment rights.  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  The "investigation" necessary to give a driver either a ticket or a warning for having a cracked taillight is not a lengthy or complicated procedure.  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *Id.*  "Authority for the seizure ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (case remanded for determination of whether traffic stop was unreasonably prolonged).

In this case, VanGesen had obtained Taylor's license, vehicle registration, and insurance card.  He had everything he needed to write a citation (or issue a warning) for the expired (by one day) insurance card.  He had already seen the cracked taillight.  Taylor agreed and already knew he had a cracked taillight.  There was nothing more to do. A trip to the back of the car to "verify" that he really had a cracked taillight was completely unnecessary for the completion of the task of enforcing the vehicle equipment laws.  The fact that VanGesen prolonged the "investigation" by conducting a frisk strongly indicates that VanGesen was fishing for evidence

---

[11] Like Taylor, McKoy was the sole occupant of the vehicle and was stopped during daylight hours.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 22
(3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

of some other unlawful conduct, such as possession of drugs.  A frisk often turns up drugs, and so VanGesen chose to subject Taylor to a frisk. Frisk first and then investigate is one thing. Investigate first, and then frisk, when the investigation is finished or nearly done, is just a further indication that there was no objectively reasonable factual basis to believe Taylor was armed and dangerous.

## VI.    CONCLUSION

Applying the principles outlined above to the present case and considering the totality of the circumstances, there are no specific facts upon which VanGesen could have formed a reasonable fear that Taylor posed a threat to the safety of VanGesen or others.  Instead, taking the facts in a light most favorable to VanGesen, his actions—like Officer Siegel in *Thomas*—reflect "a perfunctory attitude towards frisking a suspect."[12]  During his deposition, VanGesen was questioned at length on this topic and failed to articulate any specific facts to support a reasonable fear that Taylor was armed and dangerous.

VanGesen never formed a belief that Taylor was armed with a weapon because there are no specific facts in the record to reasonably support such a belief.  For example, there is no indication that VanGesen based his frisk of Taylor on any observation of a bulge in Taylor's clothing consistent with the presence of a weapon or blunt object.  *See Thomas*, 863 F.2d at 629.  Thus, VanGesen's self-serving and bare assertion that he was "worried" for his life is of no consequence.  Indeed, the vague notion that Taylor might be armed—without any specific facts supporting such a conclusion—is almost identical to the constitutionally deficient explanation in *Thomas* that Officer Siegel patted down the suspect because he "didn't want any surprises….didn't want to get in any trouble," and "wanted to see what was in front of me, make sure they didn't have a weapon on them."  *Thomas,* 863 F.2d at 629; see also *Dillard*, 818 F.3d at 876-886 (circumstances suggesting only that a suspect would be dangerous if armed are

---

[12] *Thomas*, 863 F.2d. at 629.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT "FRISK" CLAIM – 23 (3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

insufficient under the Fourth Amendment to justify a frisk).  However, as the *McKoy* court explained, these types of preemptive pat downs come "too close to allowing an automatic frisk of anyone"[13] that has been stopped—which is precisely what *Terry* and the Fourth Amendment prohibit.

In addition, the circumstances giving rise to the Incident lend no support to any purportedly reasonable belief that Taylor was armed and dangerous.  Here, for example, there is nothing about the unremarkable traffic infraction that purportedly formed the basis of VanGesen's initial decision to stop Taylor—a marginally cracked taillight—that would suggest Mr. Taylor was armed and dangerous.  *McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) (noting that the only reason for the stop was a parking and license plate violation from which no assumption about weapons may be fairly drawn, and that McKoy was the sole occupant of the vehicle and was stopped during daylight hours).  Nor did VanGesen believe that Taylor had committed any other crime or infraction, or that Taylor was under the influence of any drugs or mental illness.

It is undisputed that when asked, Taylor indicated that he was at the residence to visit Heather Sinn, provided his identification to VanGesen, did not make any gestures or other actions indicative of an intent to commit an assault, and complied with VanGesen's request to exit the vehicle.  As the *Thomas* court stressed, the way in which VanGesen conducted his investigation "cannot be used to bootstrap a justification" for his later frisk of Taylor as doing so would "indiscriminately" subject individuals to the intrusion of a pat down search.  *Thomas*, 863 F.2d at 630-.

Thus, there are no facts from which VanGesen could have formed a reasonable belief that Taylor was armed and dangerous. Therefore, Plaintiff respectfully requests that this Court grant the present motion and enter a partial summary judgment order holding defendant liable as a matter of law on the Fourth Amendment frisk claim.

---

[13] *McKoy,* 428 F.3d 38, 40 (1st Cir.2005)

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH AMENDMENT "FRISK" CLAIM – 24 (3:18-cv-05682-BHS)

TAY027-0001 6592571.docx

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

1

DATED this 15th day of June, 2021.

2

   *s/  James E. Lobsenz*
3
   *s/  Randolph J. Johnson*
   James E. Lobsenz WSBA #8787
4
   Randolph J. Johnson WSBA #50129
   Attorneys for Plaintiff
5
   CARNEY BADLEY SPELLMAN, P.S.
6
   701 Fifth Avenue, Suite 3600
   Seattle, WA 98104
7
   Tel: 206.622.8020
   lobsenz@carneylaw.com
8
   johnson@carneylaw.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT          **CARNEY BADLEY SPELLMAN, P.S.**
ON FOURTH AMENDMENT "FRISK" CLAIM – 25                        701 Fifth Avenue, Suite 3600
(3:18-cv-05682-BHS)                                                      Seattle, WA 98104-7010
                                                                              (206) 622-8020

TAY027-0001 6592571.docx

1

### CERTIFICATE OF SERVICE

2
3

I hereby certify that on this 15th day of June, 2021, I electronically filed the foregoing PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE FOURTH AMENDMENT "FRISK" CLAIM with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

4
5

**Attorneys for Defendants**
Ione S. George

6

KITSAP COUNTY PROSECUTOR'S OFFICE
614 Division St MS-35A

7

Port Orchard WA  98366-4676
igeorge@co.kitsap.wa.us

8
9

DATED this 15th day of June, 2021.

10
11

_s/ Deborah A. Groth_____

12

Legal Assistant

13
14
15
16
17
18
19
20
21
22
23
24
25
26

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON FOURTH AMENDMENT "FRISK" CLAIM – 26
(3:18-cv-05682-BHS)

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

TAY027-0001 6592571.docx